UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                              Plaintiff,

            v.

JAMES EDWARD SANDFORD, III,
a/k/a Malice,

                              Defendant.

_____

DECISION & ORDER and
REPORT & RECOMMENDATION

15-CR-6101L


## PRELIMINARY STATEMENT

By Order of Hon. David G. Larimer, United States District Judge, dated July 16,

2015, all pretrial matters in the above-captioned case have been referred to this Court pursuant to

28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 12).

Defendant James Edward Sandford, III, ("Sandford") is charged in a twelve-count

indictment.  (Docket # 9).  Count One charges him with conspiring with his brother from July

2014 through March 24, 2015 to possess with intent to distribute and to distribute various

Schedule I controlled substances and a Schedule I controlled substance analogue knowing that it

was intended for human consumption, in violation of 21 U.S.C. § 846.  (*Id.*).  Count Two charges

him with possession with intent to distribute and distribution of those controlled substances and

controlled substance analogue with 1,000 feet of a school, in violation of 21 U.S.C. § 860(a).

(*Id.*).  Counts Three and Four charge Sandford with possession with intent to distribute and

distribution of XLR11, a Schedule I controlled substance, on November 17, 2014 and November

25, 2014, respectively, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  (*Id.*).  Counts

Five and Six charge him with distribution of a Schedule I controlled substance to a person under twenty-one years of age and possession of a firearm in furtherance of that offense, in violation of 21 U.S.C. § 859(a) and 18 U.S.C. § 924(c)(1)(A)(i), respectively.  (*Id.*).  Counts Seven, Eight and Nine charge him with possession with intent to distribute Schedule I controlled substances on March 24, 2015, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  (*Id.*).  Count Ten charges him with possession with intent to distribute a controlled substance analogue knowing that it was intended for human consumption, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  (*Id.*).  The final counts in the indictment, Counts Eleven and Twelve, charge Sandford with possession of a firearm as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and possession of a stolen firearm, in violation of 18 U.S.C. §§ 922(j) and 924(a)(2), respectively.  (*Id.*).

Various motions are pending before the Court, some of which were filed by Sandford's counsel and some of which were filed by Sandford *pro se* after he had been granted leave to represent himself.  (*See* Docket # 63).  Of the motions filed by counsel, two remain pending: a motion to dismiss the indictment on the basis of grand jury irregularities and a motion to suppress tangible evidence seized on March 24, 2015 from Sandford's person and a vehicle.[1] (Docket ## 28, 44).  Of the motions filed by Sandford *pro se*, various motions to dismiss the indictment on grounds not raised by counsel remain pending.  (Docket ## 84, 92).[2]  On October

---

[1]  Sandford, through counsel, also sought severance of his trial from the trial of his co-defendant brother, Edward Sandford.  (Docket # 28).  Sandford's co-defendant has since pleaded guilty (Docket # 81), thus mooting Sandford's motion for severance.

[2]  During the period of his representation, Sandford's counsel filed omnibus motions seeking other forms of relief, including, *inter alia*, a bill of particulars, disclosure of *Brady* material, discovery and inspection, a conspiracy hearing, Rule 404(b), 608 and 609 evidence, *Jencks* material, preclusion of identification testimony, an order striking the alias, and preservation of rough notes.  (Docket # 28).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on October 2, 2015.  (Docket ## 43, 44).  In addition, the omnibus motions originally included a motion to suppress evidence seized from a storage unit.  (Docket # 28).  The Court afforded Sandford the opportunity to submit an affidavit from an individual with

2, 2015, this Court held an evidentiary hearing on Sandford's suppression motion (Docket # 72), after which Sandford and the government submitted post-hearing submissions (Docket ## 71, 80).

For the reasons discussed below, I recommend that the district court deny Sandford's motions to dismiss the indictment and to suppress tangible evidence.

## FACTUAL BACKGROUND

This Court conducted an evidentiary hearing on October 2, 2015 concerning the circumstances surrounding the seizures on March 24, 2015.[3]  (Docket # 43).  The government called Thomas Dunham ("Dunham"), a member of the Penn Yan Police Department to testify; the defense called no witnesses.  (Docket # 72).

Dunham testified that he had been employed by the Penn Yan Police Department as an officer for eleven years and as an investigator for slightly more than one year.  (Tr. 4). Dunham testified that in March 2015 he was involved in an investigation of Sandford for selling synthetic cannabinoids.  (*Id.*).  According to Dunham, during the course of the investigation, controlled purchases of synthetic marijuana were made from Sandford by a confidential informant in November 2014.  (Tr. 6, 54-55, 57).  In March 2015, Sandford lived in a multi-unit

---

knowledge establishing that he had a legally cognizable interest in the storage unit.  (*See* Docket # 33).  No such affidavit was filed and, as the defense subsequently appeared to acknowledge, Sandford has failed to demonstrate the legal authority to move to suppress evidence seized from the storage unit.  Accordingly, the district court should deny his motion to suppress evidence seized from the Penn Yan Mini Storage facility.

Over the course of the three months following Sandford's election to proceed *pro se*, he has filed numerous written motions.  (Docket ## 67, 70, 76, 84, 92).  With the exception of those noted above and addressed herein, all have been resolved or decided.  (Docket ## 68, 73, 78, 89, 93, 94).

The Court informed Sandford that any objection that he has to any of this Court's determinations should be filed with the Clerk of the Court within fourteen days of this Report and Recommendation.

[3]  The transcript of the hearing shall be referred to as "Tr. ___."  (Docket # 72).

dwelling at 115 Keuka Street in Penn Yan, New York, which was located behind a Byrne Dairy

convenience store and a gas station ("Byrne Dairy").  (Tr. 4).

   Dunham testified that on March 10, 2015, he ran a check of Sandford's driver's

license using "E Justice," a program routinely relied upon by law enforcement officers to

determine the status of an individual's license, and learned that it was suspended.  (Tr. 7-8, 30).

According to Dunham, the license check indicated that Sandford's license had been suspended

since 2009, and Dunham was aware that Sandford had been arrested by the Penn Yan Police

Department on three prior occasions for driving without a license.  (Tr. 7, 30).  Dunham testified

that he saw a printout of another "E Justice" check of Sandford's license indicating that the status

of his license remained suspended on March 24, 2015.  (Tr. 9-10).  Dunham stated that he saw

that printout in the "duty basket" at the police station on the morning of March 24, 2015, after

reporting for his 8:00 a.m. shift.  (Tr. 8-9, 10, 29).  Dunham explained that Sandford's license

check actually revealed seventeen suspensions on five separate dates, subjecting him to a

misdemeanor charge of aggravated unlicensed operation in the second degree under Section 511

of the New York State Vehicle and Traffic Law if he were to drive.  (Tr. 7, 10-11).

   Dunham testified that later that day at approximately 4:20 p.m. he drove to Byrne

Dairy to get gas and observed Sandford in the driver's seat of a 1995 Cadillac at the Byrne Dairy

gas pump.  (Tr. 11, 31-32).  Dunham explained that Byrne Dairy was accessible to vehicular

traffic through two entrance/exitways from Route 14A, a public road.  (Tr. 34).  Dunham stated

that two passengers were in the backseat and a man was outside the car washing the windshield.

(Tr. 32-33).  Dunham observed Sandford pull out and drive past him into the rear parking lot of

the Byrne Dairy, from which there was no exit to any roadway.  (Tr. 11, 12).  According to

Dunham, he was aware of information received in the investigation that individuals were buying drugs in the rear parking lot area near 115 Keuka Street.  (Tr. 12).

Dunham activated the lights on his patrol car and initiated a traffic stop of the Cadillac.  (Tr. 12-13).  The Cadillac stopped behind Byrne Dairy, and Sandford exited from the driver's seat, while the other occupants also began to get out.  (Tr. 13, 35).  Dunham ordered the occupants back into the car and arrested Sandford for aggravated unlicensed operation of a vehicle in the second degree.  (Tr. 13).  Dunham did not run another license check before arresting Sandford.[4]  (Tr. 36).  Sandford stated, "Yo, Dunham, you didn't see me drive."[5] (Tr. 13, 35).  Dunham placed Sandford in handcuffs and searched him.  (Tr. 13, 38).  Dunham testified that he recovered "a large wad of cash," approximately one-inch thick, from one pocket and "an amount of synthetic cannabinoids" from the other, along with Sandford's wallet. (Tr. 13-14, 38).  According to Dunham, the substance was contained in a wallet-sized package with the label "Jamaican Gold" and consisted of plant material that appeared, based on Dunham's training and experience, to be synthetic cannabinoids.  (Tr. 14-15, 57).  Although he could not recall whether the package was open, Dunham testified that he could tell by feel that the package contained plant material.  (Tr. 42).  Sandford was placed in the rear of a patrol car after he was searched.  (Tr. 37-38).  Dunham testified that after the traffic stop, the Cadillac was in the center of the rear parking lot and posed a potential impediment to access to the area reserved for Mennonite horse traffic.  (Tr. 44-45).

---

[4] Dunham testified that at some point after putting Sandford into the patrol car, he confirmed that Sandford's license was still suspended and learned that there was an active warrant for him from the Rochester Police Department.  (Tr. 46).

[5] Counsel for the government represented that she does not intend to offer evidence of Sandford's alleged statement at trial.  (Tr. 63).

Dunham testified that he spoke to the other occupants of the vehicle about why they were in the rear parking lot with Sandford, and none provided any explanation. (Tr. 15). That fact, coupled with Sandford's possession of a bag of suspected synthetic cannabinoids and a substantial quantity of cash, and Dunham's knowledge of reported drug sales in the back parking lot, led him to suspect that more synthetic cannabinoids were in the car that Sandford had been driving. (Tr. 16-17, 41).

Dunham also testified that the car that Sandford had been driving, which was registered to his father, was towed to an impound lot and searched pursuant to the customary policies and procedures of the Penn Yan Police Department (the "Police Department"). (Tr. 20). Dunham did not contact Sandford's father or determine whether any of the other occupants would be authorized to remove the car. (Tr. 41, 44). According to Dunham, the Police Department has some discretion to determine whether to tow a vehicle to an impound lot "in all cases involving violations of Section 511," but customarily tows a vehicle when the driver has been arrested for aggravated unlicensed operation of a vehicle in the second degree under that section. (Tr. 16, 43-44, 60). In this case, Dunham testified, the car Sandford had been driving was towed and searched in accordance with the Police Department's written vehicle impound policy, which was introduced into evidence. (Tr. 17-18; Government's Exhibit ("G. Ex.") 1).

The Police Department's policy provides that "vehicles seized under section 511 of the NYS V&T law" shall be towed to an impound lot and "sealed." (G. Ex. 1 at 1; Tr. 19). The policy further provides that "an inventory shall immediately be conducted of ALL vehicles, by the officer (or his designee) who has seized/impounded a vehicle, and a 'Property Custody Receipt' shall be completed." (G. Ex. 1 at 2). The policy specifies that the areas to be searched include closed containers, the trunk, the hood, and any other compartments in the vehicle.

(G. Ex. 1 at 2; Tr. 20).  According to the written policy, its purpose is "to protect against claims of loss, theft, vandalism, and dangerous instrumentalities which, without an inventory, might go undetected." (*Id.*).  Dunham testified that an inventory search is mandatory for all vehicles that are impounded.  (Tr. 55).

Dunham testified that he and another police officer, Officer McKnight, searched the vehicle at the impound lot.  (Tr. 20).  Officer McKnight completed an impound report indicating that clothing, footwear, tools, X-Box games, and two bottles of wine were located and left in the car.  (Tr. 23-24; G. Ex. 2).  Dunham prepared a separate property custody receipt identifying the property that was seized from the vehicle.  (Tr. 48; G. Ex. 3).  Reviewing that report, Dunham testified that among the evidence located in and seized from the car were approximately seventy-five bags of synthetic marijuana and additional currency.  (Tr. 24-27; G. Ex. 3).

## REPORT & RECOMMENDATION

### I.      Motions to Dismiss the Indictment

Sandford moves to dismiss the indictment on various grounds.  While represented by counsel, he moved for dismissal on the grounds that the grand jury likely was not properly instructed with respect to the charges (Counts One, Two and Ten) involving a controlled substance analogue.[6]  (Docket # 28 at 11-14).  Specifically, Sandford contended that the grand jury likely did not receive instructions consistent with the Supreme Court's recent decision in *McFadden v. United States*, 135 S. Ct. 2298, 2304 (2015), that "[t]he ordinary meaning of

---

[6]  The motion also apparently sought to preserve a due process challenge to the Drug Enforcement Administration's authority to emergency schedule controlled substances.  (Docket # 28 at 13-14).  As the motion acknowledges, however, the Supreme Court has rejected that argument, and it is not a basis to dismiss the indictment or any of the charges in it.  *See Touby v. United States*, 500 U.S. 160, 168-69 (1991).

§841(a)(1) . . . requires a defendant to know [] that the substance he is dealing with is some unspecified substance listed on the federal drug schedules." (*Id.* at 11-13). Alternatively, Sandford moved for disclosure of the grand jury minutes. (*Id.* at 13).

There is a presumption that grand jury proceedings are lawful and regular, *United States v. Torres*, 901 F.2d 205, 232 (2d Cir.) (quoting *Hamling v. United States*, 418 U.S. 87, 139 n.23 (1974)), *cert. denied*, 498 U.S. 906 (1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010), and disclosure of grand jury proceedings is available only by order of the Court. Fed. R. Civ. P. 6(e). A party seeking disclosure bears the burden of establishing a "particularized need" or "compelling necessity" for such disclosure that outweighs the policy of grand jury secrecy. *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211 (1979); *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959); *In re Rosahn*, 671 F.2d 690, 695 (2d Cir. 1982). Unspecified allegations of impropriety or mere speculation are not sufficient to satisfy this heavy burden. *United States Calandra*, 414 U.S. 338, 345 (1974). Therefore, "review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct." *United States v. Torres*, 901 F.2d at 233.

Moreover, "there is no requirement that federal grand jurors be instructed on the law." *United States v. Hernandez*, 2001 WL 1344832, *17 (W.D.N.Y.) (citing *United States v. Zangger*, 848 F.2d 923, 925 (8th Cir. 1988)), *report and recommendation adopted*, 2001 WL 1705118 (W.D.N.Y. 2001), *aff'd*, 63 F. App'x 6 (2d Cir. 2003); *United States v. Kenny*, 645 F.2d 1323, 1347 (9th Cir.), *cert. denied*, 452 U.S. 920 (1981). Nor is speculation that the grand jury was improperly instructed sufficient to overcome the rule of secrecy in grand jury proceedings that is embodied in Fed. R. Crim. P. 6(e). *See, e.g.*, *United States v. Donald*, 2009 WL 270181, *6 (W.D.N.Y.) (speculation about inadequacy of jury instructions insufficient to invade grand

jury secrecy), *report and recommendation adopted*, 2009 WL 960209 (W.D.N.Y. 2009), *aff'd*, 417 F. App'x 41 (2d Cir. 2011); *United States v. Jailall*, 2000 WL 1368055, *2 (S.D.N.Y. 2000) (the rule of secrecy, which can only be overcome by a showing by the defendant that grounds exist to dismiss the indictment based upon matters that occurred in the grand jury, applies to legal instructions provided to the grand jury).

Sandford's motion is based solely on speculation.  The Supreme Court's decision upon which he relies was issued on June 18, 2015, nearly a month *before* the indictment against Sandford was returned on July 14, 2015.  Nothing more than speculation supports the assertion that the grand jury was improperly or incorrectly instructed.  Speculation is no more a basis to overcome the presumption of grand jury secrecy than it is to justify dismissal of the indictment.

Counsel's motion also seeks dismissal on the grounds that Counts One and Two span a timeframe between July 2014 and March 24, 2015 and include among the controlled substances charged a substance identified as AB-CHMINACA that was not classified as a Schedule I controlled substance until January 3, 2015 (five months after the conspiracy commenced).  (*Id.* at 13).  First, the indictment includes a substantive count charging Sandford with possession with intent to distribute AB-CHMINACA on March 24, 2015 (Count Eight), a date within, albeit the last date of, the timespan charged in Counts One and Two.  Further, Counts One and Two also charge two other controlled substances and one controlled substance analogue.  Moreover, if the district judge believes that the trial evidence warrants it, he has the discretion to fashion jury instructions and special interrogatories to address this particular issue.  For these reasons, the inclusion of AB-CHMINACA in Counts One and Two does not invalidate them.[7]

---

[7]  On January 28, 2016, Sandford filed another motion raising the same issue with respect to AB-FUBINACA.  (*See* Docket # 92 at 1).  Sandford's factual premise is mistaken as AB-FUBINACA was

Sandford's *pro se* motions assert a variety of additional grounds on which he seeks dismissal of the indictment. In my estimation, none of these grounds justify the relief Sandford seeks, and I recommend that the district judge deny his motions.

First, he maintains that the indictment should be dismissed for want of federal jurisdiction. (Docket # 67 at 5). The indictment, which is sufficient on its face, charges Sandford with federal drug and firearms offenses. The fact that the charges may have stemmed from an investigation that began with state or local law enforcement officers does not mean that jurisdiction for federal charges is lacking.[8] *See United States v. Hartsfield*, 125 F.3d 863, *1 (10th Cir. 1997) (unpublished decision) ("a federal prosecution may stem from state investigatory activities, if the conduct at issue violates federal law"); *United States v. Goodapple*, 958 F.2d 1402, 1410 (7th Cir. 1992) ("federal prosecutors in this case were entitled to exercise their broad discretion to try this case in federal court where the existence of federal jurisdiction over the charged offenses is not in doubt"); *Allred v. United States*, 2009 WL 4683766, *6 (D. Utah 2009) ("when a local investigation reveals that a person has violated federal law, those violations may be referred for federal prosecution[;] . . . [f]ederal courts have jurisdiction to hear cases that are brought pursuant to federal statute").

Second, Sandford urges dismissal of Counts Five and Six on the grounds of vagueness because they do not identify the particular controlled substances that he is alleged to have distributed to the under twenty-one year-old individual. (Docket ## 84 at 2; 92). The law does not require that an indictment identify the particular controlled substance(s) underlying the

---

temporarily placed into Schedule I on February 10, 2014. *See* 79 Fed. Reg. 7577-01 (Feb. 10, 2014). I recommend denial of his motion relating to AB-FUBINACA.

[8] The exhibits to Sandford's motion papers include Dunham's incident report dated March 24, 2015, which states, "DEA Agent Brian Hanley was contacted ref. a follow up on the possession and sales of synthetic marijuana by James Sanford III." (Docket # 28, Ex. A at 4).

charge.  *See*, *e.g.*, *United States v. Soerbotten*, 398 F. App'x 686, 688 (2d Cir. 2010) ("[i]t is well

established that knowledge of the specific type of controlled substance is not an essential element

of the drug offenses for which [defendant] was convicted"); *United States v. Abdulle*, 564 F.3d

119, 125 (2d Cir. 2009) ("the law is settled that a defendant need not know the exact nature of a

drug in his possession to violate §841(a)(1); it is sufficient that he [or she] be aware that he [or

she] possesses some controlled substance") (quoting *United States v. Morales*, 577 F.2d 769, 776

(2d Cir. 1978)).  In any event, following oral argument, counsel for the government sent a letter

to the defendant identifying the Schedule I controlled substances that the government expected

its proof at trial would establish that Sandford distributed to the individual under twenty-one.

(Docket # 95).

       Third, Sandford argues that the indictment should be dismissed under the due

process clause because it is the product of prosecutorial malice and vindictiveness.  (Docket # 84

at 11-12).  Sandford alleges that after he rejected the government's plea offer, the current

indictment was returned charging him and his brother.  He also claims that the prosecutor has

vindictively threatened to charge his parents in retaliation for his decision to exercise his right to

trial.  (*Id.*).

       A presumption of vindictiveness does not arise during the pretrial plea negotiation

process, even if the prosecutor makes clear an intent to subject a defendant or a defendant's

family members to additional charges if the defendant rejects the prosecutor's plea offer.  *United*

*States v. Goodwin*, 457 U.S. 368, 380, 384 (1982) ("just as a prosecutor may forgo legitimate

charges already brought in an effort to save the time and expense of trial, a prosecutor may file

additional charges if an initial expectation that a defendant would plead guilty to lesser charges

proves unfounded[;] . . . [t]he possibility that a prosecutor would respond to a defendant's

pretrial demand for a jury trial by bringing charges not in the public interest that could be

explained only as a penalty imposed on the defendant is so *unlikely* that a presumption of

vindictiveness certainly is not warranted") (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 365

(1978) ("the course of conduct engaged in by the prosecutor in this case, which no more than

openly presented the defendant with the unpleasant alternatives of forgoing trial or facing

charges on which he was plainly subject to prosecution, did not violate the Due Process Clause

of the Fourteenth Amendment")); *United States v. Jackson*, 818 F.2d 867, *1 (6th Cir.)

(defendant alleged no reasonable likelihood of vindictiveness despite allegations that government

official threatened to pursue additional criminal charges against defendant and his family if he

did not cooperate; "[i]t is certainly within the discretion of prosecutors to attempt to induce

criminal defendants to supply information"), *cert. denied*, 484 U.S. 933 (1987); *United States v.

Sainato*, 53 F. Supp. 2d 316, 320 (E.D.N.Y. 1999) ("defendants' assertion that the

[g]overnment's current prosecution is somehow tainted because of their 'threats' in conjunction

with the rejected plea-bargains, is undermined by the well-established and constitutional

prerogative of the [g]overnment to bring otherwise legitimate charges to induce a defendant to

accept a plea bargain, and 'present[ing] the defendant with the unpleasant alternative[] of

foregoing trial or facing charges on which he is plainly subject to prosecution[;]' . . . [s]uch

'threats,' even against family members, which are fairly commonplace in plea negotiations, do

not support the defendants['] vindictiveness claim") (quoting *United States v. Stanley*, 928 F.2d

575, 579 (2d Cir.), *cert. denied*, 502 U.S. 845 (1991)); *United States v. Cleveland*, 1997 WL

178644, *6 (E.D. La. 1997) ("[t]he Fifth Circuit has explicitly held that '[i]t is generally within a

prosecutor's discretion merely to inform an accused that an implicated third person "will be

brought to book if he does not plead guilty … [and] if an accused elects to sacrifice himself for

such motives, that is his choice'"[;] . . . [and] 'threatening prosecution of third party family member is not itself legally wrong'") (collecting cases and quoting *United States v. Nuckols*, 606 F.2d 566, 569 (5th Cir. 1979) and *United States v. Diaz*, 733 F.2d 371, 375 (5th Cir. 1984)). Accordingly, I conclude that Sandford has failed to "meet the high standard required for dismissal of an indictment based on selective or vindictive prosecution," *see United States v. Korn*, 2016 WL 525870, *3 (W.D.N.Y. 2016), because he has failed to demonstrate actual vindictiveness through a showing that the prosecutor harbored genuine animus toward him, *see Johnson v. United States*, 2014 WL 4545845, *10 (E.D.N.Y. 2014), and no presumption of vindictiveness is created by the circumstances of this case.

Finally, Sandford requests dismissal on the grounds that his speedy trial rights have been violated.  (Docket # 87).  Specifically, at the time that he filed that motion (January 11, 2016), he noted that more than thirty days had elapsed without a ruling on his suppression motion and motion for an investigator.  Although he was correct as to those motions (which were fully submitted as of December 7, 2015 and November 25, 2015, respectively), he also filed multiple supplemental motions on December 23, 2015, before the thirty-day period permitted for decision on the fully-submitted motions (*see* 18 U.S.C. § 3161(h)(1)(F)) had elapsed.  The filing of the supplemental motions tolled the Speedy Trial Act until February 29, 2016 (thirty days following oral argument on the supplemental motions).  *See* 18 U.S.C. §§ 3161(h)(1)(D) and (H). *See*, *e.g.*, *United States v. Zerbe*, 596 F. Supp. 2d 267, 270 (D. Conn. 2009) (multiple defense motions filed at separate times tolled the speedy trial clock; "[a] review of the docket reveals that the multiple defense motions filed had the effect of constantly tolling the speedy trial clock"); *United States v. Glover*, 2008 WL 4696120, *3 (D. Conn. 2008) (additional motions filed by defendants while original motions were under advisement further tolled the speedy trial clock;

13

"[w]ithin 30 days after [hearing on pending motion] and before rulings had issued on all of the motions, defendants filed additional pretrial motions[;] [t]herefore, as of this writing, the speedy trial clock remains tolled as to all defendants due to the filing and pendency of pretrial motions").  Dismissal of the indictment is thus not warranted under the Speedy Trial Act.

Accordingly, for the reasons set forth above, I recommend that the district court deny Sandford's various motions to dismiss the indictment in whole or in part.

## II.   Motion to Suppress Tangible Evidence

Sandford moves to suppress the warrantless searches of his person and the vehicle he was observed driving on the grounds that he was stopped without reasonable suspicion and arrested without probable cause.  (Docket ## 28 at 14-16; 71 at 1-5).  Sandford also contends that the seizure and search of the vehicle was not a permissible impoundment and inventory search. (Docket ## 28 at 16-17; 71 at 5-8).  The government counters that probable cause supported Sandford's arrest for aggravated unlicensed operation of a vehicle in the second degree and that the vehicle search was permissible because (1) it was supported by probable cause to believe additional synthetic cannabinoids would be found in the car and, alternatively, (2) it was a lawful inventory search.  (Docket ## 37 at 16-17; 80 at 6-7).  I agree with the government that the warrantless searches of Sandford and the car he was driving were constitutional.

Dunham credibly testified that he had reliable evidence on March 24, 2015 that Sandford's license was suspended and in fact had been suspended seventeen different times over the course of five separate days.  He explained that on March 10, 2015 he had run a license check through a search mechanism that law enforcement officers customarily rely upon to determine the status of an individual's driving privileges.  He learned that Sandford's license had

been suspended seventeen different times in 2009 and remained suspended.  He further testified

that Sandford had been arrested by the Police Department on three prior occasions for driving

without a license.  Dunham testified that on the morning of March 24, 2015, he saw a printout of

a license check conducted through the same search mechanism earlier that day, which revealed

that Sandford's license was still suspended.  Finally, Dunham testified credibly that he observed

Sandford that same afternoon of March 24, 2015 in the driver's seat of a car with two backseat

passengers at the Byrne Dairy gas pump.  He observed another individual who had been washing

the windshield get into the passenger side and then watched Sandford drive away from the pump

and into the rear parking lot.  Although Dunham did not observe Sandford drive on the street, *see*

*People v. Thew*, 44 N.Y.2d 681 (1978) (rejecting argument that private parking lot was "public

highway" within meaning of Section 134 of N.Y.S. Veh. & Traf. Law), I find that Dunham had

probable cause to believe that Sandford had done so in order to enter the Byrne Dairy parking lot

where Dunham saw him behind the wheel at the gas pump and then drive away from the pump.[9]

Based on the totality of the circumstances, I find that sufficient probable cause

existed to believe that Sandford had committed a misdemeanor violation of Section 511 of the

New York State Vehicle and Traffic Law, namely, aggravated unlicensed operation of a vehicle

in the second degree.  I do not find that the passage of approximately seven hours between the

time that Dunham had seen the March 24 printout confirming the suspension of Sandford's

license and his observations of Sandford operating the Cadillac (*see* Tr. 36) undercut the

probable cause showing; here, Dunham had reliable evidence that Sandford's license had been

suspended since 2009, knew that he had been arrested on three previous occasions for driving

---

[9] Although not relevant to the probable cause to arrest analysis, Dunham testified that his review of the gas station video depicted Sandford entering the gas station from the public road.  (Tr. 58).

without a license, and never learned that Sandford had ever cleared any of his suspensions

(Tr. 59).[10]

Because Dunham had probable cause to arrest Sandford, he was also permitted to

search him incident to that arrest. *See*, *e.g.*, *United States v. Robinson*, 414 U.S. 218, 225-26

(1973); *Chimel v. California*, 395 U.S. 752, 762-63 (1969). With respect to the search of

Sanford's person, Dunham's testimony establishes that Sandford was promptly handcuffed and

taken into custody after Dunham stopped the Cadillac and promptly searched before being

placed into the backseat of a patrol car. Dunham's search was a lawful search incident to arrest,

*see*, *e.g.*, *United States v. McCloud*, 2007 WL 3354189, *13 (W.D.N.Y. 2007) (collecting cases),

*report and recommendation adopted*, 2008 WL 1926683 (W.D.N.Y. 2008); *United States v.*

*Hemingway*, 2007 WL 499470, *8 (W.D.N.Y. 2007), and I thus recommend denial of Sandford's

motion to suppress the evidence seized from his person pursuant to that search.

With respect to the vehicle seizure and search, the law provides that officers may

impound or seize a vehicle pursuant to their "community caretaking" responsibilities where the

driver is incapacitated or unlicensed. *See*, *e.g.*, *Cady v. Dombrowski*, 413 U.S. 433, 443 (1973)

(defendant was intoxicated and could not make arrangements to have vehicle moved); *Miranda*

*v. City of Cornelius*, 429 F.3d 858, 865 (9th Cir. 2005) (state need not permit driver to drive

away if driver cannot do so "in compliance with all regulations intended to ensure the vehicle's

safe operation"); *United States v. Rodriguez-Morales*, 929 F.2d 780, 795 (1st Cir. 1991) ("[u]pon

ascertaining that neither occupant was properly licensed to drive, the decision not to let the

vehicle continue on its journey was quintessentially reasonable"), *cert. denied*, 502 U.S. 1030

---

[10]  I also find that Dunham had reasonable suspicion to stop the vehicle, although reasonable suspicion
would justify only a pat frisk, rather than the more intrusive search of Sandford's pockets that was conducted here.
It is possible that Dunham would have determined that there was an outstanding warrant for Sandford, although
insufficient evidence was adduced to determine whether such a check would have been customary for a *Terry* stop
and whether the evidence Sandford had in his pockets would inevitably have been discovered.

(1992); *United States v. Velarde*, 903 F.2d 1163, 1166 (7th Cir. 1990) (neither occupant had a

valid driver's license); *United States v. Messina*, 2009 WL 455306, *3 (S.D.N.Y. 2009) (driver

arrested); *United States v. Barrios*, 2007 WL 3256945, *3 (S.D.N.Y. 2007) (vehicle was

"illegally parked, potentially unlocked [and] likely to be unattended for an unknown but

significant period of time" while the driver was booked for arrest), *aff'd*, 374 F. App'x 56 (2d

Cir.), *cert. denied*, 562 U.S. 953 (2010); *see also South Dakota v. Opperman*, 428 U.S. 364, 368

(1976) ("[i]n the interests of public safety and as part of what the [Supreme] Court has called

'community caretaking functions,' automobiles are frequently taken into police custody")

(quoting *Cady v. Dombrowski*, 413 U.S. at 441).

      Inventory searches also constitute a "well-defined exception to the Fourth

Amendment's warrant requirements."  *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994)

(citing *Colorado v. Bertine*, 479 U.S. 367, 371-72 (1987)).  "[W]hen law enforcement officials

take a vehicle into custody, they may search the vehicle and make an inventory of its contents

without need for a search warrant and without regard to whether there is probable cause to

suspect that the vehicle contains contraband or evidence of criminal conduct."  *United States v.*

*Lopez*, 547 F.3d 364, 369 (2d Cir. 2008), *cert. denied*, 129 S. Ct. 1604 (2009).  As the Supreme

Court has observed, securing and inventorying the contents of an impounded vehicle protects the

owner's property while the vehicle remains in police custody and the police from false claims of

theft or loss and potential danger.  *South Dakota v. Opperman*, 428 U.S. at 369.  "The service of

these objectives is wholly independent of whether the contents of the car figure in any way in a

criminal investigation or prosecution."  *United States v. Lopez*, 547 F.3d at 369-70.

Nevertheless, an inventory search must be conducted pursuant to "standardized criteria . . . or

established routine" in order to prevent law enforcement officers from using it as "a ruse for a

general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4

(1990). *Accord Lopez*, 547 F.3d at 370; *United States v. Thompson*, 29 F.3d at 65. "The

existence of such a valid procedure may be proven by reference to . . . written rules and

regulations." *Thompson*, 29 F.3d at 65.

    Dunham's testimony demonstrates that the decision to impound and search the

Cadillac complied with the Village of Penn Yan's Police Department's written policies and

procedures and customary practices.  First, the written policy expressly authorizes the police to

impound cars where the drivers of those vehicles have been arrested under Section 511 of the

New York's Vehicle & Traffic Law.  Although Dunham testified that the police have some

discretion to permit another to remove the car rather than to impound the car, he clearly testified

that it was common and customary practice to impound a car where the driver, like Sandford,

was arrested for aggravated unlicensed operation of a vehicle in the second degree.  Dunham

explained that the car Sandford was driving was registered to Sandford's father, who was not on

the scene, and was stopped in the middle of a parking lot belonging to a retail establishment in

such a way as to potentially impede Mennonite horse traffic.  Under these circumstances, I find

that Dunham was authorized to impound the car under the Police Department's community

caretaking function and pursuant to its established policies and procedures and customary

practices.[11]  *See*, *e.g.*, *Colorado v. Bertine*, 479 U.S. at 374 ("while giving [defendant] an

opportunity to make alternative arrangements would undoubtedly have been possible, . . . '[t]he

real question is not what "could have been achieved," but whether the Fourth Amendment

---

[11] There is disagreement among various Circuit Courts concerning whether an impoundment must be made pursuant to standardized procedures, and the Second Circuit has not yet addressed the issue.  *United States v. Sanders*, 796 F.3d 1241, 1247-48 (10th Cir. 2015); *United States v. Barrios*, 374 F. App'x 56, *57 (2d Cir.), *cert. denied*, 562 U.S. 953 (2010).  The Tenth Circuit, in addition to requiring standardized procedures, also requires a demonstration that the impoundment "is justified by a reasonable and legitimate, non-pretextual community-caretaking rationale," which involves consideration of several factors, including, *inter alia*, the location of the vehicle, whether an alternative to impoundment exists, and whether the vehicle's owner or driver has consented to impoundment.  *United States v. Sanders*, 796 F.3d at 1250.

*requires* such steps . . . [;] [t]he reasonableness of any particular governmental activity does not

necessarily or invariably turn on the existence of alternative "less intrusive" means'") (quoting

*Illinois v. Lafayette*, 462 U.S. 640, 647 (1983)); *United States v. Hockenberry*, 730 F.3d 645, 660

(6th Cir. 2013) ("the officers were not required to allow [d]efendant an alternative method of

securing the vehicle"), *cert. denied*, 134 S. Ct. 1044 (2014); *United States v. Arrocha*, 713 F.3d

1159, 1164 (8th Cir. 2013) ("[n]othing in the Fourth Amendment requires a police department to

allow an arrested person to arrange for another person to pick up his car to avoid impoundment

and inventory") (quoting *United States v. Agofsky*, 20 F.3d 866, 873 (8th Cir.), *cert. denied*, 513

U.S. 909 (1994)); *United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001) (officers were not

obligated to contact defendant's wife to determine whether she would take possession of the

vehicle), *cert. denied*, 534 U.S. 1085 (2002);*United States v. Hunnicutt*, 135 F.3d 1345, 1351

(10th Cir. 1998) (vehicle properly impounded pursuant to officers' community-caretaking

function although passenger present at the scene had a valid license and the defendant authorized

him to drive the vehicle where owner was not present at the scene; "[defendant] had no evidence

of authority to permit another to drive the vehicle"); *United States v. Walker*, 931 F.2d 1066,

1069 (5th Cir. 1991) (officer not required to permit passenger to take custody of vehicle after

driver's arrest where defendant's father owned the vehicle and "there is no indication that [the

defendant] (or his father) designated that [the passenger] or anyone else take custody of the

vehicle (or that [the] father was at or near the scene[;] . . . 'police are not required to provide

defendants with an opportunity to make alternative arrangements for the safekeeping of their

property'") (quoting *United States v. Johnson*, 815 F.2d 309, 314 (5th Cir. 1987), *cert. denied*,

484 U.S. 1068 (1988)); *United States v. Colon*, 2011 WL 569874, *15 (S.D.N.Y. 2011) (vehicle

properly impounded despite defendant's contention that he informed the officers that his wife

was available to take custody of the vehicle and that she was eight minutes away; "the [o]fficers were entitled to employ their discretion, in the name of community caretaking, and impound the car rather than arranging for the [d]efendant's wife to arrive to pick the car up"); *United States v. Gaines*, 2011 WL 744658, *4 & n.5 (S.D. Ga.) (officers were not required to permit defendant's brother to assume control over the vehicle where policy was to release a vehicle "only to a person authorized by the vehicle owner to take control of the vehicle"), *report and recommendation adopted*, 2011 WL 740728 (S.D. Ga. 2011); *United States v. Chappell*, 2010 WL 1131474, *10 n.8 (D. Minn.) (vehicle lawfully impounded despite presence of another licensed driver; "[e]ven if [d]efendant had indicated that he wanted the female passenger to drive the [vehicle] away from the scene, he could not have authorized her to do this under [the impoundment policy] because he was not the owner of the vehicle"), *report and recommendation adopted*, 2010 WL 1131473 (D. Minn. 2010); *Cansler v. City of Henderson*, 2008 WL 4500041, *6 (W.D. Ky. 2008) (officers lawfully impounded vehicle owned by defendant's mother despite defendant's request that the vehicle be released to the passenger; "the [officers] could also have reasonably refused to entrust [the passenger] with the car simply because neither [defendant/driver] nor [the passenger] owned the vehicle"); *United v. Cooley*, 119 F. Supp. 2d 824, 826, 829 (N.D. Ind. 2000) (officers lawfully declined to permit passenger to assume control of vehicle after defendant's arrest pursuant to policy requiring impoundment of vehicle unless a co-owner is present to take custody of the vehicle); *United States v. Mundy*, 806 F. Supp. 373, 376-77 (E.D.N.Y. 1992) (vehicle legally parked in hotel parking lot lawfully impounded pursuant to community caretaking function where the defendants were arrested and the vehicle would have been left unattended for an indeterminable amount of time in a high crime area).

20

I likewise find that the search of the vehicle was a permissible inventory search undertaken in compliance with the Police Department's written policy and procedures.  The policy authorizes inventory searches of vehicles that are impounded to safeguard property, to ensure against claims of theft, and to minimize danger to the community that could be posed by dangerous items left in the car – the very interests served by the inventory search exception to the Fourth Amendment's warrant requirement.  *See Opperman*, 428 U.S. at 369.  Dunham and McKnight complied with the policy by searching the vehicle and recording on two Department forms those items found and left in the car and those items seized from the car.  In addition, Dunham testified that the inventory search of the Cadillac complied with mandatory, not just discretionary, Police Department requirements.  Based upon this credible evidence, I find that the warrantless search of the Cadillac was a permissible inventory search and did not violate the Fourth Amendment.[12]

---

[12]  Because I conclude that the seizure and search of the car was a lawful impoundment and inventory search, I do not reach the government's alternative argument that the search was lawful because it was based upon probable cause to believe that the automobile contained additional synthetic cannabinoids.  *See United States v. Howard*, 489 F.3d 484, 492 (2d Cir.) (automobile exception permits law enforcement to "conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime") (quoting *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004), *cert. denied*, 544 U.S. 990 (2005)), *cert. denied*, 552 U.S. 1005 (2007).  I agree with the government that the probable cause justification is supported by evidence that Sandford had a bag of synthetic cannabinoids and a "wad of cash" on his person, had sold synthetic cannabinoids to a confidential informant several months earlier, had been observed driving to a parking lot in the rear of Byrne Dairy where, according to the information known to Dunham, drug sales had occurred, and had three passengers in his car who provided no explanation as to why Sandford drove to the rear parking lot.  What the evidence does not demonstrate, however, is whether Sanford had made the November controlled purchases from a car and whether he had ever been observed or reported engaging in drug dealing from his car or in the rear parking lot.  Had the hearing testimony included such evidence, I likely would have no difficulty determining the question of probable cause to search the car; in the absence of such evidence, I find the issue to be a closer question, but one that needs not be decided in view of the alternative constitutional justification for the search discussed above.

## DECISION & ORDER

### Sandford's Recent Motions

On January 28, 2016, Sandford filed additional motions.  (*See* Docket # 92).  His motion for a *Daubert* hearing is denied without prejudice as premature because the government has not yet made its expert disclosures under Rules 16(a)(1)(G) and (b)(1)(C) of the Federal Rules of Criminal Procedure.  When the disclosures are made, Sandford may move for a *Daubert* hearing if he believes such a hearing is warranted.  The government is hereby directed to provide those disclosures by no later than forty-five days prior to trial.[13]  Sandford's motion for inspection of evidence is granted in part (*see* Docket # 92 at 3), and the government is directed to make arrangements with Sandford to allow him to inspect evidence.  Sandford's one-sentence, conclusory motion to physically inspect St. Michael's School in Penn Yan is denied without prejudice.

## CONCLUSION

For the reasons stated above, Sandford's motions for a *Daubert* hearing and to physically inspect St. Michael's School **(Docket # 92)** are **DENIED WITHOUT PREJUDICE**, and Sandford's motion for inspection of evidence **(Docket # 92)** is **GRANTED in part**. Further, for the reasons stated above, I recommend that the district court deny Sandford's motions to dismiss the indictment and his motion to suppress tangible evidence seized on March 24, 2015 from Sandford and the vehicle he was driving.  **(Docket ## 28, 67, 84, 92)**.  I further recommend that Sandford's motion to sever **(Docket # 28)** be denied as moot and Sandford's

---

[13]  Insofar as it may not have done so, the government is directed to file and serve a notice under Fed. R. Crim. P. 12(b)(4) by no later than March 15, 2016.

motion to suppress evidence seized from the Penn Yan Mini Storage facility **(Docket # 28)** be

denied.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
February 29, 2016

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[14]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**


                                                    *s/Marian W. Payson*
                                                    MARIAN W. PAYSON
                                                    United States Magistrate Judge

Dated: Rochester, New York
       February 29, 2016

---

[14] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).